**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES, | : | |
| | : | **CRIMINAL ACTION** |
| v. | : | |
| | : | **No. 08-271** |
| DAMIAN HICKS, *et al*. | : | |

**<u>MEMORANDUM</u>**

Schiller, J.                                                      September 23, 2009

In a two-count indictment, the Government charged Damian Hicks and Alexander Smith as felons in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). The weapons underlying the charges were found during an encounter that Defendants and an additional person had with an officer from the Reading Police Department. Defendants were in a legally parked vehicle when the officer received a dispatch that caused him to investigate why the car had been parked with the engine running for over an hour with the occupants inside the vehicle. Hicks and Smith moved to suppress the guns found in the vehicle, arguing that the officer's actions constituted an unlawful search in violation of the Fourth Amendment of the United States Constitution. The Court held a hearing on the motion on September 4, 2009. For the reasons that follow, the Court grants the motion.

**I.       BACKGROUND**

On February 1, 2007, uniformed Reading Police Officer Kevin Haser, who had over four years on the force at the time, was on patrol by himself in a marked police cruiser when he received a radio call at 9:18 in the evening. (Sept. 4, 2009 Hrg. Tr. at 8-9, 69.) The dispatch reported a suspicious white Dodge Intrepid with tinted windows in the zero hundred block of Carrol Street in Reading that had been parked on the block for over an hour with the engine running. (*Id*. at 9-10.)

The original caller stated that a female – perhaps the wife of a contractor working for the caller – was in the car. (*Id*. at 42-43.) As a result of the dispatch, Officer Haser, who was two blocks away from the reported location of the Intrepid, went to the zero hundred block of Carrol Street. (*Id*. at 10.) Upon arriving on the scene, Officer Haser saw the Intrepid legally parked on the north side of the street, facing west. (*Id*. at 44.) Carrol Street is a two-way street wide enough for parking on both sides of the street as well as two lanes of travel. (*Id*. at 11.) Officer Haser double parked his patrol car in the westbound lane such that he was facing traffic. (*Id*. at 11-12, 44 ("I was parked, pretty much double parked facing the wrong direction.").) He stopped such that his patrol car was facing the Intrepid. (*Id*. at 45.) From the perspective of one inside the Intrepid, Officer Haser's car was to the left of the Intrepid and parked five to ten feet in front of it. (*Id*. at 13, 71-72.) The Intrepid would not have been able to move forward because another parked car was in front of it and Officer Haser's vehicle was in front of the Intrepid blocking its path into the travel lane. (*Id*. at 72.) Furthermore, there was a parked vehicle "a little ways behind [the Intrepid]." (*Id*.) When he arrived on the scene, Officer Haser turned on his overhead spot light and aimed it at the Intrepid, revealing at least two male occupants in the vehicle. (*Id*. at 12-13, 46-47.)

Officer Haser exited his car and approached the driver's side of the Intrepid. (*Id*. at 13.) He motioned for the driver, identified as Defendant Hicks, to roll down his window, and the driver complied. (*Id*. at 14, 48.) Officer Haser shone his flashlight into the car and while standing less than a foot from the driver, began asking questions, such as "what are you guys doing here, why are you here . . . where are you coming from . . . ?" (*Id*. at 14-15, 49.) In response, Quinten Lee, who was seated in the front passenger's seat, responded that they were waiting for the mother of his child. (*Id*. at 50.) The occupants claimed that they were coming from Wendy's, which was about four

blocks away.  (*Id*. at 16, 51.)  After these initial questions, Officer Haser instructed the driver to shut

off the engine of the Intrepid.  (*Id*. at 58-59.)

After the engine was shut off, Officer Haser asked Hicks his name and for identification.

Officer Haser testified that, at that point, Officer Zawilla was on the scene as back-up.[1]  (*Id*. at 51-

52.)  Hicks produced a Pennsylvania driver's license which he held in his hand while Officer Haser

copied the name, address and birth date on the license into his notebook.  (*Id*. at 17-18.)  Officer

Haser proceeded to the front passenger seat, where Lee was seated, and asked Lee for his name,

address, date of birth, and identification.  (*Id*. at 18.)  Lee produced a state-issued identification card

which Officer Haser examined.  (*Id*. at 18-19.)  Officer Haser then turned his attention to Smith, who

was sitting in the Intrepid's back seat.  (*Id*. at 19.)  When asked the same questions as his cohorts,

Smith replied that his name was Michael Stewart and stated that while he had identification, he did

not have any on him at that time.  (*Id*. at 19-20.)  After he received their information, Officer Haser

used the hand microphone on his radio to run the names of the Intrepid's occupants for outstanding

warrants and confirm the information provided.  (*Id*. at 20.)  A couple of minutes passed before

Officer Haser learned that Hicks had a valid driver's license and no warrants; that Lee had an

outstanding scofflaw warrant for his arrest; and that no record of a Michael Stewart existed.  (*Id*. at

22-23.)  Officer Haser confirmed that he properly took down the information from "Michael

Stewart" but again confirmed that no record existed for that name.  (*Id*. at 25.)  At that point, Officer

Haser concluded that "Michael Stewart" was a fictitious name.  (*Id*.)  "Michael Stewart" then

responded to Officer Haser that he had no form of identification on his person and that Officer Haser

_____

[1] At some point during this encounter, Officer Thomas also arrived as additional back-up.
(*Id*. at 64.)

3

"could check him if [he] wanted to."  (*Id*. at 26.)  Officer Haser then placed Lee under arrest and put

him in the back of the patrol vehicle.  (*Id*. at 26-28.)  He then returned to the Intrepid and asked

Smith, a/k/a "Michael Stewart," if he could search him for identification.  (*Id*. at 28.)  As Smith

exited the vehicle and while being searched for identification, Officer Haser noticed a small packet

of marijuana on the ground directly between Smith's feet where Smith was standing which had not

been there prior to the search of Smith.  (*Id*. at 29-30, 62-63.)  Officer Haser then placed Smith under

arrest.  (*Id*. at 31.)  Officer Haser then asked Hicks to exit the vehicle so that he could search the back

seat for more drugs.  (*Id*. at 33.)  Next, Officer Haser instructed Hicks to walk to the trunk of the

Intrepid and place his hands on the trunk; the back-up officers watched Hicks while Officer Haser

searched the Intrepid.  (*Id*. at 33-34, 65.)  While conducting the search, Officer Haser picked up a

black knit hat on the back seat to reveal a .45 caliber Warthog pistol.  (*Id*. at 35.)  Officer Haser then

told his back-up to handcuff Hicks.  (*Id*. at 36.)  Hicks ran but was quickly apprehended.  (*Id*.)

Eventually, pictures of the scene were taken and the Intrepid was taken to City Hall in Reading

where Hicks was read his *Miranda* rights and consented to a search of the vehicle.  (*Id*. at 38-39, 83,

91-93.)  The search uncovered a black nine millimeter Beretta pistol, a bag of plastic zip ties or wire

ties, black masks, zip tie handcuffs in the trunk, and a digital scale.[2]  (*Id*. at 39.)

---

[2] Additionally, the search uncovered a cell phone, which Smith stated was his.  (*Id*. at 84-85.)  However, Smith was arrested but not *Mirandized* when he gave this statement.  (*Id*. at 85-86.)  During the hearing, Smith's counsel sought to exclude this statement.  In a much-appreciated simple and direct statement by Assistant United States Attorney Joseph LaBar, the Government conceded that Smith's counsel was correct on this issue.  (*Id*. at 112.)  Although it is not necessary to address the issue, given the Court's ruling on the suppression motion, the statement about the cell phone would have to be excluded.

II.     **STANDARD OF REVIEW**

The movant bears the burden of proving, by a preponderance of the evidence, that the evidence in question should be suppressed. *United States v. Johnson,* 63 F.3d 242, 245 (3d Cir. 1995) (citing *United States v. Acosta,* 965 F.2d 1248, 1256 n.9 (3d Cir. 1992)). Once the defendant establishes that the police conducted a warrantless search, however, the burden shifts to the government to show that the search was reasonable. *Id.*

III.    **DISCUSSION**

A.     **Seizure**

The Fourth Amendment to the United States Constitution protects against "unreasonable searches and seizures." Defendants' motion to suppress requires that this Court first address when Defendants were seized, thereby implicating the Fourth Amendment. Only then can the Court address whether Officer Haser's ran afoul of the Fourth Amendment. *See United States v. Crandell*, 554 F.3d 79, 84 (3d Cir. 2009) (stating that "[b]efore even addressing whether the police had reasonable suspicion to approach [and engage an individual], the District Court [must first inquire] into whether [the individual was] seized by the police within the meaning of the Fourth Amendment.").

Although a search or seizure involving law enforcement generally requires a warrant based on probable cause, not every encounter between citizens and police officers implicates the Fourth Amendment. "Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." *United States v. Smith*, 575  F.3d 308, 312

(3d Cir. 2009) (quoting *United States v. Drayton*, 536 U.S. 194, 200 (2002)).  An integral part of police work involves daily interactions between officers and private citizens, including routine conversation and questions posed by police officers.  These routine interactions do not, without more, constitute a seizure.  *See United States v. Lockett*, 406 F.3d 207, 211 (3d Cir. 2005); *see also Crandell*, 554 F.3d  at 84 ("The Supreme Court has made clear that a Fourth Amendment 'seizure does not occur simply because a police officer approaches an individual and asks a few questions.'" (quoting *Florida v. Bostick*, 501 U.S. 429, 434 (1991)).  Furthermore, these interactions need not be based on any suspicion of wrongdoing.  *United States v. Williams*, 413 F.3d 347, 352 (3d Cir. 2005).

Rather, for a seizure to occur, a police officer's conduct, either through physical force or show of authority, must have in some way restrained an individual's liberty.  *Crandell*, 554 F.3d at 84 (quoting *Terry v. Ohio*, 392 U.S. 1, 19-20 n.16 (1968); *see also Bostick*, 501 U.S. at 434; *California v. Hodari D.*, 499 U.S. 621, 626-28 (1991) (holding that seizure required physical force by police or submission to assertion of police authority).  An individual is seized when, considering all of the circumstances surrounding the encounter, the conduct of the officer would cause a reasonable person to believe that he was not free to ignore the police and continue with his business.  *Johnson v. Campbell*, 332 F.3d 199, 205 (3d Cir. 2003) (quoting *Bostick*, 501 U.S. at 436); *see also Smith*, 575 F.3d at 313-14.  If the alleged seizure is based upon a show of authority, the defendant must have submitted to the show of authority or else there is no seizure.  *United States v. Valentine*, 232 F.3d 350, 358 (3d Cir. 2000) ("[I]f the police make a show of authority and the suspect does not submit, there is no seizure . . . 'Attempted seizures of a person are beyond the scope of the Fourth Amendment.'") (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 845 n.7 (1998)).

Relevant factors to the inquiry of whether a seizure occurred are: the threatening presence

of several officers, the display of a weapon by an officer, some physical touching of the citizen and the use of language or tone indicating that compliance with the officer's request may be required. *Smith*, 575 F.3d at 314 (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)); *see also United States v. Thame*, 846 F.2d 200, 203 (3d Cir. 1988) (number of officers involved in search relevant to detention issue). Also relevant is the length of the encounter and the position of the officers during the encounter. *See United States v. Douglass*, 467 F.3d 621, 624 (7th Cir. 2006); *see also United States v. Washington*, 490 F.3d 765, 770 (9th Cir. 2007) (finding no seizure when officer did not block the defendant's vehicle, did not activate sirens or light, did not touch weapon during encounter, and acted in courteous and cordial manner). Defendants make much of the facts that Officer Haser was uniformed and in a marked police car, but these facts are of little relevance in the equation because police officers must wear uniforms, a requirement that offers "assurance, not discomfort." *Williams*, 413 F.3d at 353 (quoting *Drayton*, 536 U.S. at 204).

At oral argument, Defendants contended that they were seized when a uniformed officer approached the car, shone a spotlight into the car, had the driver roll down the window, and began asking questions. (Hrg. Tr. at 98-99.) The Court disagrees. A uniformed police officer, who would be expected to carry a gun, may approach a legally parked vehicle and ask the occupants questions without implicating the Fourth Amendment. A consensual citizen encounter includes posing questions and requesting identification. *Hiibel v. Sixth Judicial Dist. Court of Nev.*, 542 U.S. 177, 185 (2004) ("In the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment."); *see also Florida v. Royer*, 460 U.S. 491, 501 (1983) (asking for and examining driver's license is permissible and did not turn consensual encounter into seizure); *Lockett*, 406 F.3d at 211; *Thame*, 846 F.2d at 203; *United States v. Neal*, Crim. A. No. 05-182, 2006

7

WL 572129, at *2 (W.D. Pa. Mar. 7, 2006).  Police may also request consent to perform a search provided the request does not convey a message that compliance is compelled.  *See Washington*, 490 F.3d at 770.  Furthermore, the police are under no obligation to inform the occupants that they are free to terminate the encounter and go about their business.  And the fact that Officer Haser found three males in the car rather than one female is irrelevant to the issue whether his interactions with those in the Intrepid were consensual.

Viewing the totality of the circumstances, however, this Court concludes that the occupants of the vehicle were seized when Officer Haser, whose vehicle was blocking the Intrepid from leaving, instructed the driver, Hicks, to shut off the car engine and Hicks complied.  At that point in time, Defendants were faced with a uniformed officer with a holstered weapon who had asked the driver to roll down the window and also instructed the driver to shut off the engine.  Furthermore, the Intrepid was blocked in such a way that to terminate the encounter, the driver would have had to back up from his parked spot and maneuver his car around Officer Haser's patrol car.  To accomplish this, the driver would have either had to defy Officer Haser and start the engine again or Defendants would have had to exit the vehicle and abandon the car with the officer only a few feet away.  Instead, Hicks complied with Officer Haser's show of authority and shut off the engine.  A reasonable person in the situation in which the occupants of the Intrepid found themselves would not feel free to ignore the police officer and go about his or her business.  *See United States v. Jones*, 562 F.3d 768, 772 (6th Cir. 2009) ("Here, by blocking in the Nissan, the officers had communicated to a reasonable person occupying the Nissan that he or she was not free to drive away.").

Officer Haser initially testified that he only instructed Hicks to turn off the Intrepid's engine after he requested and checked the identification of the persons in the car.  (Sept. 4, 2009 Hrg. Tr.

at 21-22, 53-54.)  However, on cross-examination, counsel reminded Officer Haser of testimony he provided during an April 2007 pretrial hearing in the Berks County Court of Common Pleas, in which he testified that a minute or two after he approached the Intrepid, and before he sought identification, he instructed that the engine be shut off.  (*Id*. at 58-59.)  He also testified at the pretrial hearing that by the time he asked Hicks for identification, "approximately" half an hour had passed. (*Id*. at 61.)  After the Court sought further clarification, Officer Haser testified that he could not remember exactly when he instructed that the engine be turned off.  (*Id*. at 87.)  But, he stated that he "would probably go with" the testimony he provided in April of 2007 at a preliminary hearing – that the instruction to shut off the engine occurred shortly before Officer Haser asked for and checked identifications.  (*Id*.)

Ultimately, Officer Haser could not recall the exact sequence of events.  (*Id*. at 87.)  This is unsurprising; as a veteran police officer, Haser has performed a number of stops and cannot be expected to remember precisely the details of every encounter.  The timing of the events in this case, however, is the determinative factor in the Court's analysis.  *See Crandell*, 554 F.3d at 85 (noting that the label a court places on an encounter can affect admissibility of evidence and if "the criminal charge rests solely on the physical evidence that is the subject of a motion to suppress[,] a ruling in the defendant's favor results in dismissing the entire case against him").  The Court found Officer Haser to be credible and forthright in his answers and finds that the testimony Officer Haser provided on this issue in April 2007 – which was less than three months after the encounter with Defendants – more likely accurately portrays when he instructed the engine be shut off.  According to that April 2007 testimony, Officer Haser asked that Hicks turn off the engine before he sought and confirmed the identification of the passengers in the Intrepid.

9

The Court finds instructive the case of *United States v. Espinoza*, 433 F. Supp. 2d 186 (D. Mass. 2006), *aff'd*, 490 F.3d 41 (1st Cir. 2007).  In *Espinoza*, the defendant was in the passenger seat of a van legally parked with the engine running when a special agent who was wearing civilian clothing and carrying a holstered firearm, approached the driver's side window, flashed his badge, and identified himself as a customs agent.   433 F. Supp. 2d at 188.   The agent requested identification from the driver and instructed him to shut off the engine.  Around this time, the officer also sought identification from the defendant.   The court concluded that the officer's actions constituted a seizure.  Because the agent observed no traffic violations, the occupants did not appear nervous or elusive and provided proper documentation, the officer did not have a reasonable suspicion that criminal activity was afoot and therefore the evidence found was suppressed. *Id*. at 190.  Similar to this case, the officer in *Espinoza* apparently instructed that the engine be shut off prior to confirming the identification he requested, although he asked for the identification before he instructed that the engine be shut off.   Additionally, in *Espinoza*, the officer parked his car approximately fifty feet away from the parked vehicle before approaching.  490 F.3d at 45.   Thus, unlike in this case, the officer's car in no way prevented or made it more difficult for the driver to terminate the encounter.

On appeal, the First Circuit affirmed.  490 F.3d 41.  On the issue of seizure, the court noted that the officer had the right to approach the parked vehicle and talk to the occupants without even reasonable suspicion.  *Id*. at 48.  The court set forth the legal framework and held that the facts presented a "near-classic case of a set of facts that might – depending on the trier's interpretation – support either of two competing inferences."  *Id*. at 49.  Because the officer ordered the engine turned off, the district court's finding that the encounter was not consensual was supported, though

not compelled. *Id*. at 50. Therefore, the district court's interpretation of the facts was not clearly erroneous and the order of suppression was upheld.

The issue of whether the events of February 1, 2007 could objectively be termed a consensual encounter is a close call. Officer Haser is not to be faulted for his actions. He received a dispatch and was duty-bound to investigate the situation even after discovering three males in the vehicle rather than one female. Police officers must be able to approach people in public and ask them questions and seek identification. Furthermore, Officer Haser's instruction that the car engine be turned off was not unreasonable. But the issue before the Court is not whether Officer Haser's actions were reasonable. Rather, the question is whether a reasonable person inside the Intrepid, viewing the totality of the circumstances, would think that he was free to terminate the conversation with the police and be on his way. The Court answers that question in the negative. Officer Haser likely instructed the engine be shut off – as well as parked his patrol vehicle as he did – to prevent the Intrepid from leaving the scene. The Court appreciates that Officer Haser was operating under difficult circumstances. He was required to approach, originally alone, three individuals in an effort to address a situation in which he could not predict what would develop. This Court, on the other hand, has the benefit of briefing by the parties, testimony and oral argument on the issues, and time to deliberate and consult case law. Officer Haser had none of those benefits. Nonetheless, the law compels this Court to determine whether Defendants were seized and if so, when they were seized. Having determined that Officer Haser's actions implicated the Fourth Amendment, the Court must determine whether those actions violated the Fourth Amendment.

**B.    Reasonable Suspicion**

"A warrantless Fourth Amendment seizure needs an objective and particularized

justification." *Crandell*, 554 F.3d at 84.   A police officer may, in accord with the Fourth Amendment, make a brief, investigatory stop if the officer has "a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (quoting *Terry*, 392 U.S. at 30).   Reasonable suspicion evades a precise definition but the analysis is based on "commonsense, nontechnical conceptions that deal with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Ornelas v. United States*, 517 U.S. 690, 695 (1996).   The reasonable suspicion standard is less demanding than the probable cause standard required to effectuate an arrest and requires a showing considerably less than a preponderance of the evidence. *Wardlow*, 528 U.S. at 123-24.   However, reasonable suspicion must be based on more than an "inchoate and unparticularized suspicion or 'hunch' of criminal activity." *Id*.; *see also Crandell*, 554 U.S. at 84.   The determination is based on the totality of the circumstances and seeks to answer whether a reasonably prudent man in the circumstances would be warranted in the belief that criminal activity was afoot or that his safety or that of others was in danger. *See Terry*, 392 U.S. at 27; *see also United States v. Robertson*, 305 F.3d 164, 167 (3d Cir. 2002).

The Court has found that a seizure occurred when Officer Haser blocked the Intrepid's path of egress and instructed Hicks to shut off the engine of the car, and that at that time, he had not yet asked for identification.   So, the Court must determine if Officer Haser had reasonable suspicion to seize the occupants of the Intrepid at that time.[3]   Officer Haser's decision to seize the occupants in

---

[3] The fact that Hicks fled the scene once ordered out of the car is irrelevant to the reasonable suspicion analysis here. *See United States v. Brown*, 448 F.3d 239, 245 (3d Cir. 2006) (concluding that attempted escape from unlawful seizure plays no role in reasonable suspicion determination).   This Court must determine whether reasonable suspicion existed at the time Defendants were seized, which this Court has concluded occurred when Officer Haser

12

the Intrepid was based on information that a vehicle was parked in the zero hundred block of Carrol Street in Reading, that it had been parked in the same location for an hour and that inside the vehicle was likely one female.  However, the information that the wife of a contractor working on the street may have been in the vehicle proved inaccurate.  Rather than a lone woman in the vehicle, multiple males occupied it.  At the time Officer Haser received the call to proceed to Carrol Street, he did not have reasonable suspicion that criminal activity was afoot.  When Officer Haser arrived on the scene, he found a legally parked vehicle and had no reason to be suspicious.   When Officer Haser approached the vehicle, he did not have reasonable suspicion – he stated that when he first saw the car, he saw nothing out of the ordinary.  (*Id*. at 70, 74.)  It was not particularly late at night and given that this incident occurred in February, it would not have been unusual for the occupants of the Intrepid to have the car running while they were inside.   Furthermore, the record contains no evidence that the car was in a high-crime area or that any criminal activity had occurred nearby.  After Officer Haser discovered that there were at least two males in the car, he still had no reason to have his suspicions raised.  Upon shining his overhead light into the car and asking the driver to roll down his window, Officer Haser still noticed nothing amiss.  (*Id*. at 74-75.)  Even when he asked the driver to roll down the window and asked some initial questions, there was still nothing odd or suspicious about the encounter.  (*Id*. at 75-77.)  Officer Haser was satisfied with the response from Lee that they were waiting for the mother of one of the occupant's children to appear.  (*Id*. at 78.) Additionally, prior to Officer Haser removing the occupants of the vehicle and searching it, he saw no weapon in plain view.  (*Id*. at 67.)  Reasonable suspicion developed only after the occupants were

---

blocked the Intrepid's exit and instructed Hicks to turn off the car's engine.  Subsequent events do not affect the reasonable suspicion analysis.  Similarly, the fact that Lee had a scofflaw warrant for his arrest and that Smith provided false information cannot be considered.

seized.  Indeed, during oral argument, counsel for the Government stated, "reasonable suspicion ripen[ed] when [Officer Haser] finds out that Mr. Lee has an open warrant for his arrest."  (*Id.* at 110.)  The Court agrees, but finds that the occupants were already seized without reasonable suspicion at that time.

Because Defendants were seized when Officer Haser blocked their vehicle with his patrol car and told them to shut off the engine of the car without reasonable suspicion or probable cause to do so, all evidence obtained in connection with the stop must be suppressed as fruit of the poisonous tree.[4]  *See Williams*, 413 F.3d at 351 (citing *Wong Sun v. United States*, 371 U.S. 471, 484 (1963)).  In the context of an illegal stop of a vehicle, "no evidence found during the stop may be used by the government against any occupant of the vehicle unless the government can show that the taint of the illegal stop was purged."  *United States v. Mosley*, 454 F.3d 249, 251 (3d Cir. 2006).

Although Smith later consented to a search of his person, given the absence of any lapse of time between the illegal stop and the consent to search, the taint of the illegal seizure was not purged.  *See Wong Sun*, 371 U.S. at 488.  The discovery of all of the evidence here – the guns and drugs – directly flowed from one uninterrupted chain of events that occurred in close temporal proximity to the improper seizure and must therefore be suppressed.  Likewise, the subsequent search of the vehicle to which Hicks consented only occurred because the occupants were arrested following their initial encounter with Officer Haser.  The Government offers no argument that the consent was valid

---

[4] Defendants also argue that Officer Haser exceeded the permissible scope of the search of the Intrepid after Hicks, Smith, and Lee were removed from the car.  The arguments of both the Government and Defendants on this point rely on the recent Supreme Court case of *Arizona v. Gant*, 129 S. Ct. 1710 (2009).  Given this Court's determinations that Defendants were seized well before this search and the evidence uncovered must therefore be suppressed, the Court will not address the application of *Gant*.

14

because the taint of the illegal search had been purged.  Instead, the Government maintains that the search of the Intrepid was a valid *Terry* search and was made before Officer Haser decided to arrest Hicks.  (Gov't Resp. to Def.'s Mot. to Suppress Physical Evidence at 9.)  Of course, having determined that Hicks was seized prior to the search of the Intrepid, the Government's argument is unavailing.


**IV.    CONCLUSION**

Based on the totality of the circumstances, Hicks and Smith were seized when Officer Haser obstructed their possible path of exit and instructed Hicks to shut off the engine.  At that time, Officer Haser lacked reasonable suspicion that criminal activity was afoot.  Accordingly, the motion to suppress is granted.  An appropriate Order will be docketed separately.